**Irene L. WRIGHT, on behalf of herself and all others similarly situated, Plaintiff–Appellant,**

v.

**ERNST & YOUNG LLP, Defendant–Appellee.**

**Docket No. 97–9241.**

United States Court of Appeals, Second Circuit.

Argued April 27, 1998.

Decided Aug. 6, 1998.

David A.P. Brower, Wolf Haldenstein Adler Freeman & Herz, New York City (Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz, New York City, Charles J.

Piven, Baltimore, MD, of counsel), for Appellant.

Bruce M. Cormier, Associate General Counsel, Ernst & Young LLP, Washington, DC (Michael J. Crane, Assistant General Counsel, Ernst & Young LLP, New York City, Robert J. Ward, Mayer, Brown & Platt, New York City, Michele Odorizzi, Mayer, Brown & Platt, Chicago, IL, of counsel), for Appellee.

Before: VAN GRAAFEILAND, MESKILL and CABRANES, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiff-appellant Irene Wright appeals from a final judgment rendered in the United States District Court for the Southern District of New York, Scheindlin, J., dismissing her amended class action complaint charging defendant accounting firm Ernst & Young LLP with making materially false representations in connection with BT Office Products' sale of common stock, all in violation of § 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5. *See Wright v. Ernst & Young LLP*, 1997 WL 563782 (S.D.N.Y. Sept. 10, 1997). The district court dismissed the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief could be granted, but *sua sponte* granted leave to replead. The plaintiff-appellant declined to replead and instead filed this appeal, asserting that the amended complaint adequately stated a cause of action for violation of federal securities law. The question we must answer is whether, under the Act, persons who purchase stock in a company that issued a press release containing false and misleading financial information, with a notation that the information is unaudited and without mention of its outside auditor, can recover from the auditor for its private approval of the information contained in the press release. We conclude that under these circumstances, primary liability is foreclosed by *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and by our recent decision in *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997). Accordingly, we affirm the judgment of the district court dismissing the amended complaint.

## BACKGROUND

The appellee, Ernst & Young LLP (Ernst & Young or the firm), is a firm engaged in the business of providing various accounting services, including auditing and financial analysis. At all relevant times, Ernst & Young was the outside auditor for BT Office Products, Inc. (BT), a corporation engaged in the distribution and sale of office products. The gravamen of the amended complaint is that Ernst & Young violated the antifraud provisions of the Act by orally approving BT's materially false and misleading financial statements that BT in turn disseminated to the public in a January 30, 1996 press release. Plaintiff-appellant Irene Wright (Wright) represents a class of investors who purchased BT common stock during the period between BT's January 30, 1996 press release and BT's public statement on March 28, 1996 disavowing the financial statements contained in that release (the class period). Wright claims that because "the market knew and relied on the fact that these financial statements were approved by [Ernst & Young]," Ernst & Young is liable for losses suffered once BT's true financial picture emerged. Wright also filed a class action suit in the Southern District of New York against BT alleging securities fraud in connection with the same set of circumstances. In March 1997, the class reached a settlement with BT under which the company agreed to pay $1,480,000 to the class.

As set forth in the amended complaint against Ernst & Young, BT embarked on a series of acquisitions in 1987, including the purchase of a stationer known as Summit Office Supply (BT–Summit). As BT expanded, its management decided to engage Ernst & Young to audit its year-end financial statements. Ernst & Young issued audit opinions certifying the accuracy of BT's financial statements for the years ending December 31, 1993 and December 31, 1994. Later, in July 1995, the firm updated and re-released

the December 31, 1994 audit opinion as a "Report of Independent Auditors" for use in BT's initial public offering prospectus, which included a statement of BT's first quarter earnings for 1995. The audit upon which that report was based included a "full-scope" audit of several BT subsidiaries, but only a "limited review" of BT–Summit's accounts.

In the fall of 1995, the firm began a new "full-scope" audit of BT–Summit. Pursuant to this effort, it discovered an under-accrual of BT–Summit's accounts payable and alerted BT management. Upon consideration, however, Ernst & Young concluded that the under-accrual was not material and advised BT that it was probably a carryover of a similar under-accrual from the year before. Accordingly, the amended complaint avers that "on January 22, 1996 [Ernst & Young] signed off on BT Office Products' 1995 financial statements ... and authorized [BT] to release its 1995 year end results with full knowledge of the fact that the market would and did interpret the release of these figures as having been approved by [Ernst & Young]." The amended complaint further states that based on Ernst & Young's oral assurances, BT issued a press release on January 30, 1996 that set forth BT's 1995 financial results and indicated strong growth during 1995. The press release also stated, however, that the figures were "unaudited" and it made no mention of Ernst & Young.

In late February and March of 1996, it became apparent to both BT and Ernst & Young that the under-accrual problem at BT–Summit was more serious than previously believed. A further investigation revealed not only that BT–Summit employees used improper accounting techniques, but substantial company funds had been embezzled. In light of these discoveries, BT announced on March 28, 1996 that it was restating its 1995 financial results from a previously announced profit of $1.5 million to a loss of $200,000. With that announcement, BT's stock lost more than 25% of its value, injuring Wright and the other class members.

The amended complaint alleges that "due to [the firm's] recklessness and failure to follow Generally Accepted Auditing Standards ('GAAS') [Ernst & Young, by electing to perform only a limited review of BT–Summit,] did not uncover the massive 'accounting and financial reporting irregularities' at BT–Summit." Allegedly because of this recklessness, Wright and other class members purchased stock at an artificially inflated price and later suffered injury once BT's true financial picture emerged.

In the proceedings before Judge Scheindlin, Ernst & Young filed a motion to dismiss, arguing, *inter alia*, that because it did not itself make any false statement to the public, the amended complaint alleged nothing more than "aiding and abetting" liability, a form of Rule 10b–5 liability that the Supreme Court abolished in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In opposing that motion, Wright argued that the amended complaint properly alleged a 10b–5 violation because it alleged that Ernst & Young provided false and misleading advice to BT, knowing that the advice would be passed on to investors. Moreover, because Ernst & Young allegedly "signed-off" or approved the financial information within that press release, Wright averred that the market understood the press release as an implied statement by Ernst & Young that the financial information contained therein was accurate. In reply, Ernst & Young pointed out that BT's January 30, 1996 press release did not purport to repeat any statement made by Ernst & Young and that the press release expressly stated that the 1995 financial results were "unaudited."

On September 9, 1997 Judge Scheindlin granted the motion to dismiss. In doing so, she rejected Wright's argument that BT's press release constituted an implied statement to the public that Ernst & Young had approved BT's financial statements, noting that such a claim was refuted by BT's statement in the press release that the 1995 financial results were "unaudited." *See Wright,* 1997 WL 563782, at *2. Further, the court observed that transforming that disclaimer into a guarantee of the statement's accuracy would "seriously deter disclosure of unaudited financial information." *Id.* The court also observed that sustaining the amended complaint in light of Ernst & Young's "clearly

tangential role in the alleged fraud would effectively revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in *Central Bank." Id.,* 1997 WL 563782 at *3. Finally, Judge Scheindlin concluded that although the amended complaint also alleged misstatements by Ernst & Young in connection with BT's 1995 initial public offering prospectus, the amended complaint failed to allege fully a § 10(b) cause of action on that ground. *Id.,* 1997 WL 563782 at *4. Accordingly, the court *sua sponte* granted Wright leave to cure the defects by filing a second amended complaint by September 29, 1997. Wright did not file a second amended complaint and accordingly, the district court entered judgment on September 30, 1997. Wright filed a notice of appeal on October 1, 1997.

## DISCUSSION

On appeal, Wright argues that the district court (1) erred in holding that the amended complaint failed to allege that Ernst & Young made an actionable misstatement within the meaning of the Act; (2) erred in crediting the "unaudited" disclaimer in BT's press release and thus erred in rejecting her allegation that the market understood the press release as an implied statement by Ernst & Young that the financial information contained therein was accurate; and (3) erred in dismissing the amended complaint because, at the very least, it stated a cause of action for failure to correct misstatements in the 1995 initial public offering prospectus.

We review *de novo* the district court's dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), taking all well-pleaded factual averments in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *See Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

1. *Actionable Statements and § 10(b)*

Wright first argues that because a defendant can incur primary liability under the Act for false statements that are not directly communicated to the public, there is no requirement that the false statement be attributed to the defendant at the time of its dissemination. Thus, Wright maintains that although BT's press release attributes no statement to Ernst & Young, the amended complaint nevertheless alleges a false statement within the meaning of § 10(b) because it alleges that Ernst & Young "assured" BT of the accuracy of its 1995 financial results, knowing that BT would, in turn, promptly disseminate those results to investors in the press release.

Further, Wright argues that even if the amended complaint does not allege conduct amounting to a false statement, it does state a § 10(b) cause of action under post-*Central Bank* authority because Ernst & Young is alleged to have "substantially participated" in the fraud. *See SEC v. First Jersey Securities,* 101 F.3d 1450, 1471 (2d Cir.1996) ("Primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" (citation omitted)), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *see also In re Software Toolworks Inc. Securities Litigation,* 50 F.3d 615, 628 n. 3 (9th Cir. 1994), *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 970 n. 12 (C.D.Cal.1994). We disagree on both counts.

We conclude that Wright's arguments are foreclosed by *Central Bank* and by our recent decision in *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997). Section 10(b) of the Act provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly . . .
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, *any manipulative or deceptive device* or contrivance

in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j (emphasis added). Its parallel regulation, SEC Rule 10b–5 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly ...

(a) To employ any device, scheme, or artifice to defraud,

(b) *To make any untrue statement of a material fact or to omit to state a material fact* necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (emphasis added). Prior to the Supreme Court's decision in *Central Bank,* a number of federal courts held that the strictures of § 10(b) reached not only those who actually make a material misstatement, but also those who aid and abet such a violation. *See Central Bank,* 511 U.S. at 169, 114 S.Ct. 1439 (citing *Brennan v. Midwestern United Life Ins. Co.,* 259 F.Supp. 673 (N.D.Ind.1966), *aff'd,* 417 F.2d 147 (7th Cir.1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); *Cleary v. Perfectune, Inc.,* 700 F.2d 774, 777 (1st Cir.1983); *Kerbs v. Fall River Indus.,* 502 F.2d 731, 740 (10th Cir.1974)). However, after the Supreme Court's strict adherence to the text of § 10(b) in such cases as *Santa Fe Indus. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), courts and commentators began to question the viability of secondary liability claims under § 10(b). *See Central Bank,* 511 U.S. at 169–70, 114 S.Ct. 1439 (citing Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934,* 69 Calif. L.Rev. 80, 82 (1981); *Benoay v. Decker,* 517 F.Supp. 490, 495 (E.D.Mich.1981), *aff'd,* 735 F.2d 1363 (6th Cir.1984)).

In *Central Bank,* the Supreme Court addressed the legitimacy of secondary liability claims in private actions brought pursuant to § 10(b). The Court concluded from the text of the Act that Congress never intended to impose secondary liability under § 10(b) and thus the Act "does not itself reach those who aid and abet ... [but] prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank,* 511 U.S. at 177, 114 S.Ct. 1439. The Court further observed that authorizing a § 10(b) cause of action based on aiding and abetting would circumvent the "reliance" requirement of Rule 10b–5 by allowing a plaintiff to prevail "without any showing that the plaintiff relied upon the aider and abettor's statements or actions." *Id.* at 180, 114 S.Ct. 1439; *see also Basic v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (rejecting liability under Rule 10b–5 without reliance). However, the Court did not hold that secondary actors are always free from liability under the Act. Rather, secondary actors like accountants may be held liable as primary violators if *all* the requirements for primary liability are met, including "a material misstatement (or omission) on which a purchaser or seller of securities relies." *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439.

In the wake of *Central Bank,* federal courts have differed over the threshold required for a secondary actor's conduct to implicate primary liability. As Judge Gleeson of the Eastern District of New York observed,

[s]ome courts have held that a third party's review and approval of documents containing fraudulent statements is not actionable under Section 10(b) because one must *make* the material misstatement or omission in order to be a primary violator. *See, e.g., In re Kendall Square Research Corporation Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994) (accountant's "review and approval" of financial statements and prospectuses insufficient); *Vosgerichian v. Commodore International,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994) (allegations that accountant "advised" and "guid[ed]" client in making allegedly fraudulent misrepresentations insufficient).

Other [courts] have held that third parties may be primarily liable for statements made by others in which the defendant had significant participation. *See, e.g., In re Software Toolworks,* 50 F.3d 615, 628 n. 3 (9th Cir.1994) (accountant may be primarily liable based on its "significant role in drafting and editing" a letter sent by the issuer to the SEC); ... *In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 970 (C.D.Cal.1994) (an accounting firm that was "intricately involved" in the creation of false documents and their "resulting deception" is a primary violator of section 10(b)).

*In re MTC Electronic Technologies Shareholders Litigation,* 898 F.Supp. 974, 986 (E.D.N.Y.1995) (second alteration in original). These two differing approaches have been characterized respectively as the "bright line" test and the "substantial[ ] participat[ion]" test. *Id.; see also Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226–27 (10th Cir.1996).

■ In *Shapiro,* we followed the "bright line" test after observing that " '[i]f *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).' " *Shapiro,* 123 F.3d at 720 (quoting *In re MTC Electronic Technologies Shareholders Litigation,* 898 F.Supp. at 987). We also observed that because § 10(b) and Rule 10b–5 focus on fraud made in connection with the sale or purchase of securities, a defendant must " 'know or should know' " that *his* representation would be communicated to investors. *Id.* at 720 (quoting *Anixter,* 77 F.3d at 1226). "There is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach." *Anixter,* 77 F.3d at 1226. However, contrary to Wright's argument, a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as "[r]eliance only on representations made by others

cannot itself form the basis of liability." *Id.* at 1225. Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision. *See In re Kendall Square Research Corp. Securities Litigation,* 868 F.Supp. at 28 (where accountant did not issue a report on the company's financial statements, but merely "reviewed and approved" them, the accountant could not be liable for a material misstatement); *see also* 5 Alan R. Bromberg & Lewis D. Lowenfels, Bromberg and Lowenfels on Securities Fraud & Commodities Fraud, § 8.56, at 336 (New Matter) (2d ed.1996) (in the aftermath of *Central Bank,* "accountants *whose reports appear[ ]* in an otherwise fraudulent document[ ]" may incur primary liability under the Act) (emphasis added).

■ In this case, BT's press release did not attribute any assurances to Ernst & Young and, in fact, did not mention Ernst & Young at all. Thus, Ernst & Young neither directly nor indirectly communicated misrepresentations to investors. Therefore, the amended complaint failed to allege that Ernst & Young made "a material misstatement (or omission) on which a purchaser or seller of securities relie[d]." *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439. Moreover, as the district court aptly recognized, because the press release contained a clear and express warning that no audit had yet been completed, there is no basis for Wright to claim that Ernst & Young had endorsed the accuracy of those results. We therefore agree with the district court that holding Ernst & Young primarily liable under the Act "in spite of its clearly tangential role in the alleged fraud would effectively revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in *Central Bank.*" *Wright,* 1997 WL 563782, at *3.

Wright also argues that under the post-*Central Bank* authority of this Circuit, the amended complaint nevertheless states a cause of action because Ernst & Young is alleged to have "substantially participated" in the fraud. Specifically, Wright cites our decision in *First Jersey,* 101 F.3d at 1471, for

the proposition that "[p]rimary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *Id.* (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994)). Wright's argument is unpersuasive.

■ In *First Jersey,* we affirmed the imposition of primary liability under § 10(b) on Robert Brennan, the president, chief executive and sole owner of First Jersey Securities, Inc. Brennan had directed his employees to make false and misleading statements to customers. We held Brennan liable for securities fraud in his capacity as a "controlling person," that is, for fraud planned and directed by upper level management. *Id.* at 1471–74. Here, we confront alleged fraud by accountants—secondary actors who may no longer be held primarily liable under § 10(b) for mere knowledge and assistance in the fraud. *See Central Bank,* 511 U.S. at 177, 114 S.Ct. 1439; *see also IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (knowledge and substantial assistance are two of the three prongs for pre-*Central Bank* aiding and abetting liability).

■ In 1995, Congress authorized the SEC to bring enforcement actions against those who "knowingly provide[ ] substantial assistance to another person" in violation of the federal securities laws. *See* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, § 104, 109 Stat. 737, 757, *codified in* 15 U.S.C. § 78t(f). That congressional act did not create a private cause of action.

Finally, Wright argues that we should follow other jurisdictions that have adopted the substantial participation test. *See In re Software Toolworks Inc. Securities Litigation,* 50 F.3d at 628 n. 3; *In re ZZZZ Best Securities Litigation,* 864 F.Supp. at 970 n. 12. We decline to do so. *See Shapiro,* 123 F.3d at 720. Moreover, even under the "substantial participation" test, we would be hard pressed to conclude that the amended complaint alleged an actionable misrepresentation within the meaning of § 10(b). *See Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432 (N.D.Ill.1995) (where court applies substan-

tial participation test, accounting firm may not incur primary liability for a misstatement unless that statement is "certified, audited, prepared or reported"); *see also Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1125 (7th Cir.1990) (accounting firm could not be held liable for aiding and abetting under pre-*Central Bank* standard even where company alleged that "but for" accounting firm's consent, company would not have issued prospectus containing false and misleading financial statements), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

### 2. *The "Unaudited" Disclaimer*

Wright next argues that the district court erred in giving effect to BT's disclaimer in the press release which stated that the financial results were "unaudited." Wright prays that by rendering that disclaimer ineffective, we might breathe new life into her averment that the market understood BT's press release as an implied assertion by Ernst & Young that BT's financial statements were accurate. Specifically, Wright argues that the district court (a) erred in relying on the "bespeaks caution doctrine" in crediting that disclaimer; (b) erred in resolving disputed facts regarding what the market would implicitly understand by a company's release of financial results and an accountant's role in that release; (c) erred in giving effect to the word "unaudited" when such a disclaimer cannot negate Ernst & Young's own pivotal conduct in causing the dissemination of the false financial results; and (d) erred by allowing accountants to hide behind the word "unaudited," in contravention to the broad remedial purposes of the Act.

Wright cannot prevail regardless of how we treat the disclaimer. As noted, Ernst & Young's assurances were never communicated to the public either directly or indirectly. BT issued the press release without a whisper of Ernst & Young's involvement. Thus, in order to resurrect Wright's claim that Ernst & Young made an actionable statement within the meaning of § 10(b), we would have to do more than just refuse to give effect to the "unaudited" disclaimer. We would also have to ignore the absence of any mention of Ernst & Young in BT's press

release and focus instead on what the market might have implicitly "understood" about Ernst & Young's involvement in that press release. In other words, we would have to grant Wright an exception to the rule established by the Supreme Court that secondary actors such as accountants may not be held primarily liable unless they themselves have made "a material misstatement (or omission) on which a purchaser or seller of securities relies." *Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. We find no justification for granting such an exception. *See, e.g., In re Fidelity/Micron Securities Litigation*, 964 F.Supp. 539, 543–44 (D.Mass.1997) (holding that a mutual fund, Magellan, cannot be held primarily liable on a theory of respondeat superior for the alleged misstatements of its fund manager, notwithstanding plaintiff's contention " 'that the market *understood* that [the fund manager] spoke for Magellan' " (emphasis added)). We also perceive no affront to the remedial purposes of the Act. While the Act does carry broad remedial purposes, the Act may not be "amend[ed] . . . to create liability for acts that are not themselves manipulative or deceptive *within the meaning of the statute*." *Central Bank*, 511 U.S. at 177–78, 114 S.Ct. 1439 (emphasis added). Aiding and abetting liability is simply not covered by the Act. Accordingly, we conclude that the district court did not err in so holding.

3. *The Amended Complaint and Other Actionable Statements*

In addition to its allegations regarding the press release, the amended complaint alleged that Ernst & Young had made a false statement in connection with BT's 1995 initial public offering prospectus. Specifically, in the amended complaint, Wright alleged that in a Report of Independent Auditors included in BT's prospectus, Ernst & Young certified the accuracy of BT's 1994 financial statements and BT's earnings for the first quarter of 1995, but "did not disclose that it only had performed a limited review of BT Summit." This report, the amended complaint alleged, was false and misleading. However, the district court concluded that the amended complaint failed to allege fully a § 10(b) cause of action on that ground because it failed to allege all the requirements for a Rule 10b–5 violation. Accordingly, the court *sua sponte* granted Wright leave to cure the defect. Wright, however, elected to file this appeal rather than replead.

On appeal, Wright argues that the amended complaint adequately states a cause of action for failure to correct the false financial information contained in that prospectus because by January 1996, Ernst & Young discovered facts tending to undermine the accuracy of those financial statements. Specifically, Wright argues in her brief that:

> Plaintiff alleged a misstatement—the Report of Independent Auditors, signed by [Ernst & Young]; that the misstatement was material as evidenced by the fact that [BT's] financial results for 1994 eventually were restated; that the market relied on this misinformation as reflected in [BT's] stock price; and that defendant [Ernst & Young] was reckless, at least by January 1996, in not correcting this misstatement.

We disagree. In order to survive a motion to dismiss, a plaintiff bringing an action pursuant to § 10(b) and Rule 10b–5 must "plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996). Accounting firms "do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying." *Cornfeld*, 619 F.2d at 927; *see also SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1095 (2d Cir.1972) ("Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors." (footnote omitted)); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1304–05 (2d Cir.1973) (scienter requires that a defendant act deliberately or recklessly). Silence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b–5. *See Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. 978.

**178**

In this case, however, although the amended complaint alleges that the prospectus contained false statements.(*i.e.*, the inaccurate 1994 results) in 1995, it does *not* allege the misrepresentation claim that Wright presses on appeal—namely, that Ernst & Young made a false statement (by omission) in 1996 as a result of its duty and subsequent failure to correct those statements. In fact, an alleged duty to correct does not appear anywhere in the amended complaint and did not enter the case until Wright mentioned it for the first time in her opposition memoranda to the motion to dismiss. *See Cornfeld,* 619 F.2d at 914 & n. 6 (a party is not entitled to amend its complaint through statements made in motion papers); *see also Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 526 (S.D.N.Y.1977) (party may not amend pleading through statements in briefs). Furthermore, the amended complaint fails to allege that Ernst & Young knew or was reckless in not knowing in 1995 that the Report of Independent Auditors contained false financial information, that the market or those who purchased BT's stock during the 1996 class period relied on the 1995 report, or that the 1995 report caused damages. Accordingly, we find no basis for Wright's contention that the amended complaint states a § 10(b) cause of action.

Because Wright elected to stand on the amended complaint rather than replead by September 29, 1997, Ernst & Young argues that Wright has waived her opportunity to file a second amended complaint. We conclude that because the district court entered judgment in this action on September 30, 1997, Wright may not file a second amended complaint without first obtaining vacatur of that final judgment, which she has not done on this appeal.

## CONCLUSION

*Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997), foreclose primary liability under the Act for false or misleading statements made by Ernst & Young because no false or misleading statement was attributed to Ernst & Young at the time of public dissemination. Accordingly, the district court did not err in dismissing the amended complaint on that ground. Further, we also agree with the district court that the amended complaint fails to state a cause of action under § 10(b) and Rule 10b-5 for failure to correct misstatements made in connection with the sale or purchase of securities. Accordingly, the judgment of the district court is affirmed.