Ronald HART, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

INTERNET WIRE, INC. and
Bloomberg, L.P.,
Defendants.

No. 00 Civ. 6571(MP).

United States District Court,
S.D. New York.

June 14, 2001.

Schatz & Nobel, P.C. (Patrick A. Kling-man, Andrew M. Schatz, Jeffrey S. Nobel, of counsel), Hartford, CT, for Plaintiffs.

Latham & Watkins (Kenneth Conboy, Elena C. Norman, of counsel), New York City, for Defendant Internet Wire, Inc.

Willkie Farr & Gallagher (Richard L. Klein, Thomas H. Golden, of counsel), New York City, for Defendant Bloomberg L.P.

Latham & Watkins (Robert W. Perrin, of counsel), Los Angeles, CA, for Defendant Internet Wire, Inc.

## OPINION AND ORDER

MILTON POLLACK, Senior District Judge.

Each defendant herein has moved this Court for a dismissal of the amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This is a class action on behalf of the holders of stock and options of Emulex, a manufacturer of computer communications devices, and is asserted in connection with transactions which occurred on August 25, 2000 on the NASDAQ.

The defendant, Internet Wire, is a news wire service which distributes corporate news, including press releases, to the public. The defendant, Bloomberg, is a world wide news organization and publisher by a variety of media of financial and business news, from such services as the co-defendant, Internet Wire.

The suit is based on a mistakenly reported news release issued by Internet Wire and picked up and re-issued by Bloomberg, which turned out to have been false, the work of a fraudster, one Mark Simeon Jakob, a former employee of Internet Wire, who was indicted criminally and convicted on a guilty plea.

Jakob was a short seller of Emulex stock in which he had a substantial paper

loss, and utilizing knowledge of the internal mechanics of how press releases are submitted by Internet Wire, concocted a false release that was distributed by Internet Wire reporting serious problems at Emulex: that its earnings were being restated; that the company's Chief Executive Officer was resigning; that the Securities Exchange Commission ("SEC") had launched an investigation. The release was automatically re-broadcast by members of the general press, including by the defendant, Bloomberg.

The fraudulent release caused the company's stock to plummet on the NASDAQ by $60 a share in just 16 minutes, (enabling Jakob to cover his short position at a profit) resulting in an estimated $2.2 billion lost market capitalization and $1.10 million in loss to investors in Emulex securities in the interim before trading was stopped.

## DISCUSSION

### Mark Jakob's Hoax *

Emulex Corp. ("Emulex") is a manufacturer of computer communications devices, and is based in California. Securities issued by Emulex are publically traded on the NASDAQ. On or about August 17 and 18, 2000, Mark Simeon Jakob, a former Internet Wire employee, bought "short" positions on 3,000 shares of Emulex stock, anticipating a drop in the shares' price. When the price rose instead, Jakob, faced with losses of as much as $97,000, hatched a scheme to drive the price of Emulex stock down and recover his losses by disseminating a false report about supposed problems at the company.

As a former employee of Internet Wire, Jakob knew the internal mechanics of how press releases are submitted to, and published by, Internet Wire.

On August 24, 2000, armed with this knowledge, Jakob initiated his plot to drive down the price of Emulex stock. Posing as a public relations executive named "Ross Porter" acting on behalf of Emulex, Jakob sent an e-mail to Internet Wire's Content Production Department, requesting that an attached press release be distributed by Internet Wire the next morning at 9:30 a.m. Eastern Time. Internet Wire's Content Production staff treated both the e-mail and attached Press Release as genuine.

The Press Release reported serious problems at Emulex: earnings were being restated, the company's Chief Executive Officer was resigning, and the SEC had launched an investigation. At approximately 9:30 a.m. Eastern Time, it was automatically re-broadcast by members of the general press, including Bloomberg. As republished by Bloomberg, the Press Release contained certain typographical errors. At approximately 10:13 a.m. Eastern Time, Bloomberg published a headline repeating the Press Release's statement that Emulex's CEO was resigning and that the SEC was investigating the company. One minute later, Bloomberg issued a second headline based on the press release, this one repeating the Press Release's statement that Emulex was restating its fourth quarter results. In publishing the Press Release, Bloomberg performed no independent investigation of its authenticity.

As the contents of the Press Release circulated around the financial community, Emulex stock was the subject of intense selling, and the price dropped by up to $60

* The information set out herein is expressed in plaintiffs' Amended Complaint except as otherwise noted.

per share. At 10:29 a.m. Eastern Time—less than an hour after the Press Release was published, and 15 minutes after the Bloomberg headlines ran, NASDAQ suspended trading in Emulex stock. Within a few minutes, Emulex exposed the Press Release as bogus, and issued genuine press releases dispelling the allegations made in the false report. Upon becoming aware of the hoax, at 10:57 a.m. Eastern Time, Bloomberg reported on it. After trading resumed, the stock's price rebounded to close at $105.75 per share.

Within days after the hoax was exposed, Matthew Winkler, the editor in chief of Bloomberg News, was quoted in *The Wall Street Journal* expressing regret that the news was carried over the Bloomberg system, stating that "Bloomberg had been right to report on the news release, especially since Emulex stock was already dropping" but that he was "disappointed in his organization's handling of the episode."

In late August 2000, FBI agents arrested Jakob and charged him with securities fraud and wire fraud. On December 28, 2000, Jakob pleaded guilty before Judge Tevrizian of the United States District Court for the Central District of California. Sentencing has been deferred to June 18, 2001.

Stripped of the interesting questions that do not reach the jugular is the decisive one to which the answer blocks maintenance of this suit.

■ All of defendants' other arguments attacked by the plaintiffs herein are set up to create seeming factual disputes to avoid dismissal based on the face of the amended complaint. However, the *bête noir* is that fraud is not sufficiently asserted here—because there is no suggestion of claim herein that defendants were aware of the fraudulent nature of the release and issued their releases with intent to defraud.

In the search for a false representation by the defendants to sustain a claim of federal fraud, plaintiffs point to paragraphs 34 and 35 of their amended complaint which read:

34. The issuance of the Bloomberg **Headlines constituted** false representations that Bloomberg had independently verified that Emulex had reported that

(i) Emulex's CEO had resigned,

(ii) Emulex's accounting was being investigated by the SEC, and

(iii) Emulex would be revising prior financial results to a loss instead of a net gain. (Bold supplied)

Those conclusions—("Headlines constituted")—were followed by further conclusory assertions in paragraph 34 of:

a. What investors believed,

b. What investors were reasonable in concluding,

c. What later led investors to conclude.

The amended complaint in paragraph 35 then refers to the foregoing conclusions of what the headlines "constituted" and tags them as "Bloomberg's representations set forth in Paragraph 34 above" and charges the plaintiffs' conclusions "to be false and misleading," since "Bloomberg did not perform any investigation whatsoever . . . but, instead, Bloomberg relied solely on the Fake Press Release."

It is thus apparent from the pleading (confirmed on argument in Court) that there is nothing in the complaint which charges Bloomberg with any more than a construction that Bloomberg did not verify the fact that the Release was false, investigated only by an unanswered telephone call to Emulex and mistakenly proceeded on by Bloomberg and Internet Wire on the appearance of the Release itself.

The complaint is devoid of any suggestion that defendants were aware of the fraudulent nature of the release and there is no allegation in the complaint that defendants "issued their releases with intent to defraud." Instead the complaint is mounted only on the pleaders' constructions of the presumed negligent actions of the defendants. The transcript of the argument on the motions confirms that.

A **10b–5**\*\* case requires intentional misconduct and this is not a 10b–5 case. Neither defendant herein is charged with intent to defraud Emulex investors when each mistakenly reported on the fake press release. No charge is made that the defendants had a reason to defraud investors.

The plaintiffs seek support for their complaint in suggestions of recklessness on the part of defendants. They apparently concede, as they must, that the notion of "recklessness" under 10b–5 requires intentional misconduct. No allegation in the amended complaint even remotely suggests—let alone gives rise to a strong inference—that either defendant intended to defraud Emulex investors when they mistakenly reported on the fake press release. Plaintiffs fail to plead any facts suggesting that defendants acted with actual malice.

■ Rule 10b–5 scienter means intent to defraud and even when plaintiffs rely on the "recklessness" prong of scienter, they still must show that the defendants acted with fraudulent intent. Recklessness would constitute 10b–5 scienter only where the accusations give rise to the statutory requirement of a strong inference of fraudulent intent. Pleading a failure to heed "storm warnings" does not suffice and absence of any plausible fraudulent motive negates any suggestion thereof. Nor is there any pleading of a motive for deliberately remaining ignorant of the facts in question to render any plausible suggestion of a characterization of willful blindness. Neither defendant is charged with any motive for deliberately shutting its eyes to the facts or had any interest in remaining ignorant that they were in the process of concealing the fraud. Neither defendant is charged with deliberate intent not to expose the fraud.

■ The plaintiffs' suggestion that defendants should have detected signs of Mark Jakob's fraud, without more, is palpably insufficient to plead recklessness sufficient to establish Section 10 liability as long as defendants did not deliberately shut their eyes to the facts—intent to defraud is the underlying criterion of asserted liability. Recognizing that a 10b–5 claim against Bloomberg requires a knowing misstatement, plaintiffs claim in their brief that, by merely reporting on the substance of the Release, Bloomberg represented that it had confirmed with Emulex. Plaintiffs do not allege in their amended complaint that Bloomberg ever actually said that it had verified the Release. The totality of the Bloomberg statements about Emulex was simply "Emulex CEO Steps Down; SEC to Investigate Accounting" and "Emulex to Revise 4th Qtr Results to Loss From Net." Plaintiffs claim that it does not matter that Bloomberg never actually said that it verified the Release with Emulex, because a hypothetical investor might have "inferred" that Bloomberg had done so. Mere "repetition of the material submitted by summarizing its content or effect and ascribing it to sources deemed reliable without vouching for it as their own or adding any factual matter of their own cannot be deemed a basis on which to assert a claim of federal securities fraud against the publications." *See In re Re-*

\*\* 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240. 10b–5

*public Nat'l. Life Ins. Co.*, 387 F.Supp. 902 (S.D.N.Y.1975) (Pollack, J.).

*Plaintiffs Fail Adequately To Plead Scienter.*

The Second Circuit has held that the Private Securities Litigation Reform Act of 1995 ("PSLRA") codified the Second Circuit's pre-PSLRA pleading standard for scienter. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) (Newman, J.) ("By enacting this pleading requirement, Congress did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity' ") (citations omitted)). Therefore, we may apply the standards for scienter that have been developed in this Circuit.

■ While "Section 10(b) is aptly described as a catchall provision, . . . what it catches must be fraud." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citation omitted). Thus, to satisfy the scienter element of Section 10(b), a complaint must allege facts giving rise to a strong inference that the defendant acted with "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Shapiro v. Cantor*, 123 F.3d 717, 720–21 (2d Cir.1997) ("[a] claim under [Section] 10(b) must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security"). Failure to plead this basic element is grounds for dismissal of a Section 10(b) claim. *See, e.g., Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (affirming dismissal of Section 10(b) claims where allegations regarding scienter were deficient).

*The Force of Alleged Reckless Behavior*

■ A 10(b) plaintiff who relies on a recklessness theory is not relieved of the burden to plead and prove fraudulent intent; "recklessness" for 10b–5 purposes is conduct that is "equivalent to willful fraud." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978); *see also Novak v. Kasaks* 216 F.3d 300, 312 (2d Cir.2000) (Recklessness is found in information that contradicted their public statements in "a state of mind approximating actual intent, and not merely a heightened form of negligence"), *cert. denied*, —— U.S. ——, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); *Chill v. GE Co.*, 101 F.3d 263, 269 (2d Cir.1996) (where the plaintiff proceeds under a recklessness theory, defendants' actions must approximate an actual intent to aid in the fraud being perpetrated, and must be established to such an extent that a "reasonable finder of fact could actually infer fraudulent intent from it.").

■ Conclusory allegations of fraudulent intent will not save a complaint from dismissal. Rule 9(b) of the Federal Rules of Civil Procedure requires 10b–5 plaintiffs, like all plaintiffs alleging fraud, to state scienter allegations "with particularity." Similarly, the PSLRA, which was enacted in large part to deter frivolous securities lawsuits, requires a securities fraud plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Thus, merely conclusory allegations that a defendant "knew or [was] reckless in not knowing" the true facts will not satisfy a plaintiff's pleading requirements. *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994).

Plaintiffs do not allege that defendants intended to defraud anyone when they reported on the purported Press Release. Rather, Plaintiffs claim that defendants

were reckless in not realizing that the Press Release was the work of a fraudster. Plaintiffs' theory fails as a matter of law.

*Plaintiffs Fail To Plead Particularized Facts That Would Support A Finding That Bloomberg Acted With Fraudulent Intent*

■ Under Second Circuit jurisprudence, a plaintiff can establish the requisite "strong inference of fraudulent intent" either by (1) factual allegations that defendants had both motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Chill,* 101 F.3d at 267; *Gabriel Capital, LP v. Natwest Fin., Inc.,* 137 F.Supp.2d 251, 261 (S.D.N.Y.2000). Plaintiffs fail to satisfy either prong.

■ Plaintiffs do not claim that Bloomberg had a motive to defraud Emulex investors, and they do not allege that defendants had an opportunity to benefit from the brief misimpression created by the bogus Press Release. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields,* 25 F.3d at 1130. Plaintiffs make no allegation that defendants owned Emulex stock, that defendants traded on the misinformation in the Press Release, or that defendants stood to gain in any manner by misleading Emulex investors. Instead, the Amended Complaint merely speculates (without support) that Bloomberg published the information without further investigation because they may have wanted to be the first news sources to break the story. This, of course, presupposes that defendants thought the "news" was genuine.

■ Thus, plaintiffs' suggestion that in a race to be first, defendants published a story they knew (or even suspected) to be false, simply does not suffice. Indeed, defendants' lack of motive belies plaintiffs' theory that they acted with fraudulent intent. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997) ("[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."); *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 643 (N.D.Tex.1999) (dismissing 10b–5 complaint where, among other things, the "alleged motive to commit fraud is not plausible as pleaded"); *SEC v. Shattuck Denn Mining Corp.,* 297 F.Supp. 470, 476 (S.D.N.Y.1968) (declining to award injunctive relief against corporate defendant where there was "no showing that [it] derived any benefit from such nondisclosure, or that its purpose was to affect the market price of [its] stock to the advantage of [it] or any of its insiders").

■ To be sure, motive is not a *sine qua non* of a securities fraud claim. But where motive and opportunity do not exist, "the strength of the circumstantial allegations [regarding fraudulent intent] must be correspondingly greater," and the plaintiff must "allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *In re WRT Energy Sec. Litig.,* No. 96 Div. 3610(JFK), 1999 WL 178749, at *8–9 (S.D.N.Y. Mar. 31, 1999) (quoting *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988)), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (*en banc*); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 121 (2d Cir.1982). Plaintiffs' do not plead with particularity that defendants either knew or suspected that the Press Release was false.

Plaintiffs' Complaint reveals that defendants were used as unwitting dupes by Jakob. This does not give rise to a securities fraud claim against them. *See Elliott Assocs., L.P. v. Convance, Inc.* No. 00 Civ. 4115(SAS), 2000 WL 1752848, at \*6 (S.D.N.Y. Nov. 28, 2000) ("a complaint which fails to adduce any specific facts supporting an inference of *knowledgeable participation* in the alleged fraud" will not survive a motion to dismiss) (emphasis added).

The Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), forecloses plaintiffs' effort to impose liability on Bloomberg for conduct that falls far short of direct and knowing participation in Jakob's fraud. *Central Bank* held that Section 10(b) "prohibits only the making of a material misstatement ... (or omission) or the commission of a manipulative act," *Central Bank,* 511 U.S. at 177, 114 S.Ct. 1439. "The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* Thus, under *Central Bank,* a party cannot be held liable under Section 10(b) even for knowingly aiding and abetting securities fraud. *A fortiori,* one cannot be held liable for unknowingly assisting a fraudster in furthering his scheme.

The Court of Appeals recognized as much in *Wright v. Ernst & Young, LLP,* 152 F.3d 169 (2d Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999), in which plaintiffs sought to impose liability on Ernst & Young for "signing off" on its client's misleading financial statements, even though those statements as published made no mention of Ernst & Young. The Second Circuit affirmed the dismissal of the complaint, holding that plaintiffs' theory was foreclosed by *Central Bank.* In doing so, the Sec-

ond Circuit agreed with this Court that were it to find Ernst & Young liable under Section 10(b) "in spite of its clearly tangential role in the alleged fraud [that] would effectively revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in *Central Bank." Wright,* 152 F.3d at 175 (internal quotations omitted). The unwitting role that Bloomberg played in Jakob's fraud falls far short of the knowing participation required for Section 10(b) liability.

Plaintiffs do not contend that defendants knew the Press Release was false. Nor do plaintiffs contend that defendants actually entertained doubts about the legitimacy of the Press Release at the time it was disseminated and published. Rather, plaintiffs allege that certain errors in the Press Release, as disseminated, constituted "red flags" that *should have* prompted Bloomberg to make further investigation. Decisions by the Second Circuit and by this Court unambiguously foreclose plaintiffs' efforts to impose 10b–5 liability on defendants for failing to recognize that plaintiffs, in hindsight, see as "red flags." Simply stated, allegations that defendants "should have known" that the Press Release was fraudulent are insufficient to plead recklessness under 10b–5. "[I]f recklessness means something more culpable than negligence, as it must, then an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." *Troyer v. Karcagi,* 476 F.Supp. 1142, 1152 (S.D.N.Y.1979). Rather, "to withstand a motion to dismiss plaintiffs must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question." *Elliott Assocs., L.P.,* 2000 WL 1752848, at \*7. Thus, even an "egregious" failure to gather information will not establish 10b–5 liability as

long as the defendants did not "deliberately shut their eyes to the facts." *In re Fischbach Corp. Sec. Litig.*, No. 89 Civ. 5826(KMW), 1992 WL 8715, at *7 (S.D.N.Y. Jan. 15, 1992).

The Second Circuit's decision in *Chill* is instructive on this point. There, plaintiffs sought to impose 10b–5 liability on a parent corporation for incorporating the misstatements of one of its subsidiaries, arguing that the parent company "was reckless in its failure to heed the [host of] 'red warning flags'" in the subsidiary's financial statements. *Chill*, 101 F.3d at 268. The Second Circuit affirmed Judge Keenan's dismissal of the complaint, finding that the failure to heed such supposed warnings signs would not constitute "intentional, knowing or reckless activity" for purposes of 10b–5 liability. *Chill*, 101 F.3d at 266. In doing so, the Court noted that fraud cannot be inferred merely because the defendants "might have been more curious or concerned" about the matters in question. *Id.* at 270; *see also Shields*, 25 F.3d at 1129 (allegations "strongly suggest [ ] that the defendants would have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud"); *Wright*, 152 F.3d at 172 (allegation that [defendants] failed to uncover "massive accounting and financial reporting irregularities" was insufficient to impose 10(b) liability on it).

Decisions by this Court to the same effect are legion. In *In re WRT*, for instance, Judge Keenan held that allegations of recklessness based on the failure of underwriters to perform adequate investigation were insufficient to state a claim under Rule 10b–5. Judge Keenan found that allegations as to what defendant "should have turned up" constituted "negligence at best," and are insufficient as a matter of law to plead securities fraud. *In re WRT*, 1999 WL 178749, at *10. Simi-

larly, in *Feasby v. Industri–Matematik Int'l Corp.*, No. 99 Civ. 8761(HB), 2000 WL 977673, (S.D.N.Y. July 17, 2000), plaintiffs sued certain corporate directors and officers, seeking to impose liability on them for a series of allegedly false and misleading statements regarding the Company's future profitability. There, Judge Baer held that plaintiff's assertion that underlying adverse information "must have been obvious to the defendants" was insufficient proof of fraudulent intent, stating that "[s]uch 'intuition' on the part of plaintiffs—without particularized facts—is insufficient under the pleading requirements of Rule 9(b) and [the PSLRA]" *Id.* at *7. In *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256 (S.D.N.Y.1989), Judge Leisure held there the allegation that an accounting firm "should have . . . independently confirmed and verified" the information at issue was insufficient to support an inference of recklessness. *Id.* at 259. And in *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387 (S.D.N.Y.1988), Judge Carter held that "[e]ven if [the defendant] should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on [the defendant's] part, its 'failure [to make further inquiries does] not rise above the level of negligence, which is legally insufficient.'" *Id.* at 394 (citation omitted) (brackets in original).

■ Plaintiffs contend that "it was Bloomberg's standard practice" to confirm press releases, and suggest that such a practice, combined with Bloomberg's reputation as a reliable news source, should give rise to 10b–5 liability on Bloomberg's part for failing to discover Jakob's fraud. Courts have refused to assign 10b–5 liability merely for a violation of a defendant's standard practices and procedures. *See, e.g., Stevelman v. Alias Research Inc.*, 174

F.3d 79 (2d Cir.1999) (violations of industry standards are not enough to show scienter); *Chill,* 101 F.3d at 270 (finding that "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194 (S.D.N.Y.1999) (finding that violations of Company's accounting policies and various professional standards, without proof of intent to defraud, were not sufficient to allege fraud under § 10(b)). "It is also unfair to use professionals' self-imposed standards, which may exceed industry standards, against them to try to prove fraud. This violates public policy which encourages the highest standards, in order to protect the public." *In re Worlds of Wonder Sec. Litig.,* 147 F.R.D. 214, 217 (N.D.Cal.1992).

The Second Circuit has cautioned against "allow[ing] plaintiffs to proceed with allegations of 'fraud by hindsight.'" *Novak,* 216 F.3d at 309; *see also Shields,* 25 F.3d at 1129 ("[w]e have rejected the legitimacy of 'alleging fraud by hindsight.'"); *Feasby,* 2000 WL 977673, at *4 ("Plaintiffs cannot prevail [on a 10b–5 claim] by using crystal balls or $^{20}\!\!/_{20}$ hindsight"). The critical issue is what defendants knew at the time they carried the Press Release. Plaintiffs fail to allege that defendants at that time knew the Press Release was false, or even that defendants in fact entertained doubts about the Press Release's validity. These failures are fatal to their claim.

■ Apparently recognizing that defendants cannot be held liable merely for publishing the bogus Press Release, plaintiffs make the unsupported claim that in reporting on that Release, defendants represented that it had independently verified that it was genuine. This theory fails for the simple reason that nothing in the complaint alleges that Bloomberg made any such representation.

■ "[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Shapiro,* 123 F.3d 717, 720 (internal quotations omitted). In light of this bedrock requirement, courts will not impose Section 10(b) liability based merely on "inferences" that a plaintiff claims to have drawn from an otherwise unactionable statement. For instance, in *Wright, supra,* plaintiff sought to impose liability on Ernst & Young for misrepresentations made in a client's press release, on the theory that the public inferred that Ernst & Young had approved the statement. In dismissing the complaint, the District Court rejected the argument that the press release, which made no mention of Ernst & Young, "constituted an implied statement to the public that Ernst & Young had approved [the client's] financial statements." *Wright,* 152 F.3d at 172. The Second Circuit agreed, making clear that the Court's focus must be on the subject statement itself, and not "what the market might have implicitly 'understood'" about what the statement meant. *Id.* 152 F.3d at 176–77.

By alleging that Bloomberg implied that it had verified the Press Release, plaintiffs simply impose a convenient but unsupportable inference. Although plaintiffs allege that "Bloomberg caused investors to believe that . . . Bloomberg had independently verified the information it reported," they fail to point to a single statement by Bloomberg to the effect that it had verified the contents of the Press Release. This falls far short of the PSLRA's requirement that a plaintiff state with particularity the contents of the allegedly fraudulent statement. *Feasby,* 2000 WL 977673, at *4, 6. Nor is there any merit to plaintiffs' argument that Bloomberg should be held to

have made such a representation by the mere fact of its reputation as a news organization. Bloomberg's general reliability cannot substitute as an affirmative representation that it verified any particular press release, nor does it relieve plaintiffs of their burden of pleading the elements of a Section 10(b) claim.

Accordingly, the Amended Complaint is dismissed with leave to replead in 20 days hereof should plaintiffs deem that they can consistently herewith frame a sufficient complaint.

So Ordered