In re: **LIVENT, INC. NOTEHOLDERS SECURITIES LITIGATION**

**No. 98 CIV 7161(VM).**

United States District Court, S.D. New York.

Nov. 27, 2001.

Stanley M. Grossman, Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross LLP, New York City, Lionel Z. Glancy, Peter A. Binkow, Los Angeles, CA, Donald R. Wager, Los Angeles, CA, for Dorian King, plaintiff.

Ronald A. Nimkoff, Harvey B. Silkovitz, Schechter & Nimkoff, L.L.P., New York City, for Garth H. Drabinsky and Myron I. Gottlieb, defendants.

Harvey L. Pitt, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Garth H. Drabinsky, defendant.

Lee S. Richards, Richards, Spears, Kibbe & Orbe, New York City, for Myron I. Gottlieb, defendant.

John T. Behrendt, Peter Justus Beshar, Aric Hugo Wu, Lee Gordon Dunst, Gibson, Dunn & Crutcher, L.L.P., New York City, for Deloitte & Touche Chartered Accountants, defendants.

James S. Dittmar, Sanford F. Remz, William J. Connolly, III, Hutchins, Wheeler & Dittmar, Boston, MA, for Joseph L. Rotman, Thomas H. Lee, James A. Patterson ans ScottSperling, defendants.

D. Brian Hufford, Pomerant Haudek Block, Grossman & Gross LLP, New York City, for Eckstein, Robert Topal, H. Garfield Emerson, A. Alfred Taubman, CIBC Oppenheimer, consolidated defendants.

Cynthia A. Feigin, W. Sidney Davis, Hogan & Hartson, L.L.P., New York City, for Rbert Topal, consolidated defendant.

Greg A. Danilow, Stephen A. Radin, Sofia Giatrakos, Weil, Gotshal & Manges, L.L.P., New York City, for H. Garfield Emerson, consolidated defendant.

Eric M. Roth, Wachtell, Lipton, Rosen & Katz, New York City, for A. Alfred Taubman, consolidated defendant.

Leon P. Gold, Leslie J. Harris, Proskauer, Rose, L.L.P., New York City, for Daniel D. Brambilla, defendant.

Jonathan Rosenberg, Bradley Jay Butwin, James L. Burns, O'Sullivan L.L.P., New York City, for Martin Goldfarb, defendant.

Greg A. Danilow, Stephen A. Radin, Sofia Giatrakos, Weil, Gotshal & Manges, L.L.P., New York City, for H. Garfield Emerson, cross–claimant.

D. Brian Hufford, Pomerant Haudek Block Grossman & Gross LLP, New York City, for H. Garfield Emerson and A. Alfred Taubman, cross–claimants.

Lee S. Richards, Richards, Spears, Kibbe & Orbe, New York City, for Myron I. Gottlieb, cross–defendant.

D. Brian Hufford, Pomerant Haudek Block Grossman & Gross LLP, New York City, for Gordon Eckstein, cross–defendant.

Eric M. Roth, Wachtell, Lipton, Rosen & Katz, New York City, for A. Alfred Taubman, cross–claimant.

Jonathan Rosenberg, O'Sullivan L.L.P., Bradley Jay Butwin, James L. Burns, O'Sullivan, L.L.P., New York City, for Martin Goldfarb, cross–claimant.

Harvey B. Silikovitz, Schechter & Nimkoff, L.L.P., New York City, for Garth H. Drabinsky and Myron I. Gottlieb, cross–defendants.

Leon P. Gold, Leslie J. Harris, Proskauer, Rose, L.L.P., New York City, for Daniel D. Brambilla, cross–claimant.

James S. Dittmar, William J. Connolly, III, Sanford F. Remz, Hutchins, Wheeler & Dittmar, Boston, MA, for Thomas H. Lee, James A. Pattison, Scott Sperling, Joseph L. Rotman, cross–claimants.

John T. Behrendt, Peter Justus Beshar, Aric Hugo Wu, Lee Gordon Dunst, Gibson, Dunn and Crutcher, L.L.P., New York City, for Deloitte & Touche Chartered Accountants, cross–claimant.

MARRERO, District Judge.

## I.   *BACKGROUND*

On June 29, 2001 this Court issued a Decision and Order (hereinafter the "June Decision") in which it ruled on numerous motions brought in this class action by the various defendants, pursuant to Fed. R.Civ.P. 12(b)(6) and the Private Securities

Litigation Reform Act (hereinafter "PSLRA"), 15 U.S.C. §§ 78u–4(b) 1 & 2 to dismiss the complaint for failure to state a claim under the federal securities laws.[1] In the June Decision, the Court set forth the pertinent facts and its reading of the law applicable to this matter; familiarity with the June Decision is assumed here.

In ruling on the sufficiency of the Second Amended Complaint filed by plaintiff noteholders (hereinafter the "Noteholders"), the Court dismissed the three claims asserted against defendants CIBC Wood Gundy Securities, Inc. (hereinafter "CIBC Wood Gundy") and CIBC Oppenheimer Securities Corp. (hereinafter collectively "CIBC"). Those claims were brought pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (hereinafter the "Exchange Act"), and §§ 11 and 12 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77l(a)(2) (hereinafter the "Securities Act"). As to the § 10(b) and § 11 claims, the Court granted leave to replead.[2]

With regard to the Noteholders' § 10(b) claim, the Court found that the Second Amended Complaint adequately detailed the allegations concerning CIBC's involvement in Livent's fraud related to an arrangement it entered with CIBC Wood Gundy in December 1997 (hereinafter the "CIBC Wood Gundy Agreement"). The transaction embodied in that agreement involved what publicly was purported to be a bona fide investment providing for CIBC's purchase of production and royalty rights in certain Livent shows in exchange for a fee of $4.6 million (Can.) characterized in the agreement as non-refundable. See Livent Noteholders, 151 F.Supp.2d at 394. However, a secret side letter, signed the same day and reaffirmed months later, contradicted the investment agreement and required Livent to repurchase within six months the production rights it had sold to CIBC for an amount corresponding to the same $4.6 million, plus substantial interest and penalties in the event of a default. Thus, publicly the CIBC Agreement appeared to be a one-time revenue-generating investment in Livent. Treating it as such, Livent included the full proceeds of the purchase as income in its financial statements for 1997. By reason of the secret side letter, however, the transaction was in fact a short-term bridge loan by which Livent incurred ongoing repayment obligations not properly accounted for or publicly disclosed. The transaction also enabled Livent to present to investors and securities regulators a materially misleading impression of its actual financial condition for that year.

While accepting that the Noteholders' description of this arrangement alleged what on its face appeared to be a fraudulent transaction involving CIBC and Livent, as set forth in the Second Amended Complaint, the Court found it insufficient to state a § 10(b) claim. See id. at 432.

---

**1.** The Court's ruling on these motions is reported at In re Livent Noteholders Sec. Litig., 151 F.Supp.2d 371 (S.D.N.Y.2001) (hereinafter "Livent Noteholders "). In a related class action instituted by holders of Livent equity securities, the Court ruled on similar motions on the same day. See In re Livent Sec. Litig., 148 F.Supp.2d 331 (S.D.N.Y.2001).

**2.** The Court granted the motion to dismiss the Noteholders' § 12 claim with prejudice based on the Noteholders consent. See Livent Note-

holders, 151 F.Supp.2d at 433. The Noteholders assert in connection with the instant motion that they do not replead this claim, although they retain it in their Third Amendment Complaint to preserve appellate rights. (Plaintiffs' Memorandum of Law in Opposition to the CIBC Defendants' Motion to Dismiss the Third Consolidated Amended Complaint, dated October 1, 2001 (hereinafter the "Noteholders' Memo") at 1 n. 1.)

In particular, the Court concluded that the complaint did not detail with the specificity required by Fed.R.Civ.P. 9(b) and the PSLRA:

> how CIBC participated in misrepresenting Livent's financial condition to the investing public, or CIBC's involvement in the sale of the Notes, or how CIBC benefitted in some concrete and personal way from the alleged fraudulent conduct that would represent an extreme departure from the standards of ordinary care.[3]

*Id.* (citing *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000)). The Court observed that in their papers opposing CIBC's motion to dismiss, the Noteholders claimed that CIBC, without disclosing its participation in Livent's fraud, solicited them to purchase Notes that CIBC underwriters were holding for their own account. This allegation, however, was not set forth in the complaint. *See id.* The Court nonetheless concluded that "it is not at all clear that the Noteholders could not state a [§ 10(b)] claim against CIBC" on the basis of their allegations regarding the CIBC Wood Gundy Agreement. *Id.* at 433.

Concerning the Noteholders' § 11 claim, the Court dismissed the action as to all three of the financial institutions the Noteholders alleged, in their Second Amended Complaint, had acted as underwriters in the sale of the Notes. As to two of those firms, PaineWebber and Furman Selz, the claim was dismissed with prejudice because the Court found insufficient the allegations that the Noteholders had purchased Notes from them in public sales of registered securities. The Court distinguished the position of CIBC because the Noteholders had argued in their opposition to the motion that CIBC had publicly sold registered Notes directly to them. Because this allegation was not found in the complaint, the Court granted leave to replead the Noteholders' § 11 claim against CIBC.

The Noteholders filed a Third Amended Complaint (hereinafter the "TAC") which is the subject of the motion now before the Court. The TAC endeavors to address the deficiencies that prompted dismissal of the Noteholders' CIBC claims. Specifically, the Noteholders now add allegations that:

- CIBC solicited the Noteholders, including various Qualified Institutional Buyers (hereinafter the "QIBs") and other investors, to purchase Notes from CIBC without disclosing material facts such as Livent's true financial conditions and its business practices and the CIBC Wood Gundy Agreement. (TAC ¶ 243.)

- the class representative Noteholders purchased their Notes directly from CIBC after being personally solicited for their purchase by a CIBC broker. (*Id.* at ¶ 265.)

- CIBC directly participated in the alleged fraud by soliciting and selling Notes to QIBs and to the public without disclosing

---

**3.** To clarify any misapprehension, the Court must note that its focus on these deficiencies was meant in part to offer illustrative guidance. It should not be construed as necessarily setting forth specific factual predicates for a § 10(b) cause of action with each and every one presumably mandated by statute or case law to be pleaded in order to state a § 10(b) claim. The Court recognizes that under the applicable Second Circuit standards described in the June Decision, § 10(b) liability may be established alternatively under either of two prongs discussed below, and that the types of details the Court found lacking in the Second Amended Complaint's claims against CIBC could pertain to one or the other test. But in identifying these specific examples of factual flaws in the Noteholders' § 10(b) pleadings, the Court's ruling does not suggest that both prongs of the scienter test must be satisfied.

material facts concerning Livent's financial condition and business practices, including the CIBC Wood Gundy Agreement's secret side understanding. (*Id.* at ¶ 299.)

- CIBC solicited the QIBs to purchase Notes in the private placement on October 10, 1997 and a CIBC broker personally solicited the class representatives and other Noteholders to purchase the Notes after they had been registered. (*Id.* at ¶ 300.)

In its renewed motion to dismiss, CIBC argues that these additional allegations fail to remedy the infirmities the Court identified in the Noteholders' Second Amended Complaint. Specifically, CIBC argues that the TAC does not allege any new facts demonstrating that CIBC acted with the necessary scienter to defraud investors, that CIBC made any misrepresentations to investing Noteholders, or that CIBC was an underwriter of the Notes in a public offering. Thus CIBC contends that the TAC continues to be insufficient as a matter of law to state violations pursuant to § 10(b) of the Exchange Act and § 11 of the Securities Act. The Court disagrees, and for the reasons discussed below denies CIBC's motion.

## II. *DISCUSSION*

### A. *SECTION 10(b)*

In its June Decision, the Court recognized that the Noteholders' pleadings had sufficiently detailed CIBC's participation in the CIBC Wood Gundy Agreement, the proceeds of which Livent falsely reported in Livent's accounts and public statements as a non-refundable investment. These allegations indicate that, by effectively becoming an accomplice of Livent's misconduct by means of the CIBC Wood Gundy Agreement, CIBC had knowledge of at least some portions of Livent's alleged

fraud. The secret side letters exchanged in that arrangement could reasonably be construed as an element of Livent's improper accounting of income and false or misleading public statements regarding its financial condition. However, such assistance and participation in a securities law violation, without more, would not suffice to establish primary liability under § 10(b). *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

■ To state a securities fraud claim under § 10(b), a plaintiff must allege facts sufficient to establish five elements: that (1) misrepresentations or omissions of material fact were made by or properly attributed to defendant; (2) defendant acted with intent to defraud; (3) the false or misleading statements were made in connection with the purchase or sale of covered securities; (4) plaintiff relied on such statements; and (5) plaintiff's reliance was the proximate cause of the claimed injury. *See Kowal v. IBM (In Re IBM Corporate Sec. Litig.)*, 163 F.3d 102, 106 (2d Cir. 1998); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996).

■ With regard to the scienter element, plaintiff must plead, with the particularity both Fed.R.Civ.P. 9(b) and the PSLRA demand as to claims of fraud, factual assertions that give rise to a "strong inference" that the defendant acted with the requisite state of mind. *See* 15 U.S.C. § 78u–4(b)(2); *Livent Noteholders*, 151 F.Supp.2d at 405, 409–13, 417–26 (citing cases). In this Circuit the scienter requirement may be satisfied by sufficient factual assertions that either (1) constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) show that defendants had both motive and opportunity to commit fraud. *See Livent*

*Noteholders,* 151 F. Supp 2d at 420–21 (citing *Rothman v. Gregor,* 220 F.3d 81, 90–91 (2d Cir.2000) and *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000)). The particularity standard requires that the plaintiff must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (citation omitted).

What this Court identified as lacking in the Noteholders' claim for the purposes of § 10(b) liability was a sufficient link between CIBC's alleged awareness of and participation in Livent's fraudulent scheme, and an actual public misrepresentation made by or attributed to CIBC in connection with the purchase or sale of securities on the basis of which the Noteholders made their investment decision. *See Livent Noteholders,* 151 F.Supp.2d at 432; *see also Kowal,* 163 F.3d at 106. In the Second Amended Complaint, the Noteholders averred merely that CIBC knew of Livent's actual financial condition and participated in publicly misrepresenting the truth to the investing public in connection with sales of the Notes, and that CIBC "solicited and were substantial factors in plaintiffs' purchase of the Notes." *Livent Noteholders,* 151 F.Supp.2d at 432 (quoting the Second Amended Complaint ¶¶ 33 and 245).

CIBC's act of solicitation by itself, or serving as a "substantial factor" in connection with a particular securities transaction, however, does not demonstrate the asserted fraud. These allegations fail to show either that the Noteholders actually purchased Notes from CIBC or that whatever injury they suffered was caused by the material misstatement that induced Notes sales to them and was communicated by CIBC itself rather than by Livent or some other securities dealer. To this extent the Court deemed the claim deficient in two ways: (1) unless the Noteholders demonstrated concretely that they purchased Notes from CIBC, they would lack standing to sue CIBC, and (2) absent a clear indication that their purchase was actually made from CIBC, they could not satisfy the element of their reliance on CIBC misrepresentations made at the time of investment for which CIBC may be held liable.

■ The Court finds that the TAC addresses these flaws. The added pleadings assert that CIBC directly participated in the fraud by "soliciting and selling Notes to QIBs and to the public, including the Noteholders, without disclosing material facts concerning Livent's financial condition and CIBC's role in the CIBC Wood Gundy Agreement." (TAC ¶¶ 243, 299). Moreover, the Noteholders now assert that CIBC "personally" solicited the class representatives and other Noteholders to purchase Notes *"after they had been registered."* (TAC ¶ 300 (emphasis added)).

The import of these supplemental assertions is to furnish the missing connection between CIBC's alleged knowledge of and role in Livent's fraud and the misleading material statements or omissions CIBC allegedly made to the class representatives and other Noteholders not only in connection with solicitations but with the actual sales at issue. Communication goes to the very essence of solicitation and sale, serving as the medium by which business courtship transforms into trade. Just as, in the words of T.S. Eliot, "Between the motion/And the act/Falls the shadow," [4] between the solicitation and the sale lies

**4.** T.S. Eliot, "The Hollow Men," in *The Complete Poems and Plays 1909–1950* 57 (1958).

the representation. Inherent in that consummation is the utterance of decisive words upon which the finished commerce is grounded.

The Noteholders' assertion that CIBC personally solicited and sold them the Notes at issue necessarily suggests some representation by the seller that enabled the transaction to succeed. It does not require an unreasonable inferential leap to conclude, as the Noteholders suggest, that in entering into the bridge loan transaction and secret side agreements with Livent, CIBC, as Livent's investment bankers since 1993, had acquired substantial knowledge of Livent's real financial condition and was aware of Livent's reasons to account for the $4.6 million "non-refundable fee" as a revenue-generating investment rather than a repayable loan. Further, one can infer that in directly soliciting and selling securities to public investors, CIBC effectively communicated that Livent's false accounting of the $4.6 million proceeds from the CIBC Wood Gundy Agreement as current revenue, rather than as a loan, was accurate.

In addition, by alleging that CIBC's role in Livent's fraud included general solicitation of purchases of Notes and actual sales to Noteholders, QIBs and other investors, even after the registration of the Notes, the TAC adds a dimension of CIBC complicity in the alleged wrongdoing which provides stronger support for an inference of culpability. Standing alone, whatever may have been the state of CIBC's knowledge concerning other components of the extensive Livent fraud and deceit the Noteholders allege, and whether or not CIBC had any public duty to disclose Livent's overall financial condition to investors it solicited, may not be dispositive of CIBC's § 10(b) liability. However, the particular aspect of Livent's misconduct described by the Noteholders here entailed a substantial transaction which CIBC, acting as Livent's bankers, played an integral role in structuring and publicly misrepresenting in concert with Livent executives. Significantly, according to the complaint, the proceeds from the alleged fraudulent arrangement were reported by Livent as current revenue in its accounts and public registration statements in order create a false financial basis to reinforce and ensure the success of Livent securities issues intended in part to repay Livent's substantial debt to CIBC.[5]

From these allegations, it is fair to infer that in entering into the CIBC Wood Gundy Agreement, CIBC was aware not only that Livent contemplated marketing securities on the basis of public representations of its financial condition that Livent knew to be false, but that CIBC itself subsequently undertook to solicit and sell the very securities whose value incorporated and was affected by the falsehood CIBC itself had conceived with Livent. In this

---

**5.** Specifically, the TAC asserts in this regard that: "CIBC Wood Gundy ... had been investment bankers for Livent since 1993. Among other things, CIBC had extended a line of credit to Livent in the amount of C[anadian] $50 million, and the CIBC Defendants participated in the $125 million Note offering. The proceeds of the Notes that are the subject of this action were used in part to pay off Livent's indebtedness to CIBC. The CIBC Defendants, as a result of their longstanding, intimate relationship with Livent, knew of Livent's financial condition and di-rectly participated in misrepresenting that condition to the investing public in connection with the sale of Notes and otherwise. The CIBC Defendants used the CIBC Agreement to portray a false confidence in Livent's financial condition, when, in fact, as reflected in the true terms of the entire, secret CIBC Agreement, the CIBC Defendants knew of Livent's depleted financial condition and had little confidence in Livent's ability to pay its debts. As such, they became willing participants in the fraud to further their own interests." (TAC ¶ 246.)

manner, CIBC's participation in Livent's fraudulent scheme went beyond a passive capacity as Livent's investment banker and financial adviser. The Noteholders' contentions suggest that by soliciting and selling Notes whose financial worth and soundness rested in part on a material misrepresentation it helped Livent create, CIBC became a primary actor in propagating Livent's fraud to the Noteholders and the investing public.

On this basis, the Court regards the allegations now sufficient to satisfy the § 10(b) scienter standard under either prong of the test: the TAC contains factual assertions that (1) constitute strong circumstantial evidence of conscious misbehavior or recklessness, and (2) show that defendants had both motive and opportunity to commit fraud. *See Rothman,* 220 F.3d at 90–91; *Novak,* 216 F.3d at 311. CIBC's particularized solicitations and sales of Notes in the context of its own involvement in a transaction that misrepresented the true value of those securities constitutes strong circumstantial evidence of conscious misbehavior or an extreme departure from standards of ordinary care that crossed into the realm of recklessness. By the same token, CIBC's active role in solicitation and sales of the Notes under the circumstances detailed in the TAC more clearly establishes that CIBC had reason to benefit in some concrete and personal way from the alleged fraud sufficient to satisfy the motive and opportunity standard. *See Rothman,* 220 F.3d at 90.

The Court is satisfied that, based upon the totality of the circumstances the TAC recites, and drawing all reasonable inferences in the Noteholders' favor, the allegations forming the Noteholders' § 10(b) claim against CIBC are not grounded merely on insufficient speculation or conclusory statements. *See Chill v. General Elec.,* 101 F.3d 263, 267 (2d Cir.1996).

There is nothing vague, conclusory or universally applicable, as CIBC argues, about the Noteholders' factual assertions concerning CIBC's direct interest in Livent's securities transactions and CIBC's substantial personal incentive in ensuring the profitability and success of the Notes sales by itself disseminating Livent's misrepresentation of its financial condition. The Noteholders have pled facts suggesting that CIBC became part and parcel of Livent's misleading statements by entering into a loan transaction whose true character and financial implications it agreed not to disclose. This financial interest and complicity not only assisted Livent in concealing critical information, it also committed CIBC to similarly withhold the truth from investors with whom it dealt in Livent securities, a commitment that effectively conflicted with any applicable duty CIBC had to disclose material facts in connection with subsequent public sales of such securities affected by the transaction.

Rather than generally reflecting the profit motive of any securities dealer, the concrete benefit derived by CIBC from Livent's fraud alleged here was uniquely personal to CIBC in several ways. Only CIBC, as Livent's investment bankers since 1993, is alleged to have had a long-standing, intimate relationship with Livent executives that offered it uncommon opportunity to know of, and play an active role in Livent's, financial affairs. And only CIBC is accused, in furtherance of its own motives, of assisting Livent in structuring and keeping secret the misrepresented CIBC Wood Gundy Agreement. Later, in publicly marketing Livent securities whose value partly depended on the true nature of that agreement, CIBC stood to realize gains particular to it. Beyond the standard fees and commissions associated with any investment bank's sales of securities, CIBC had a higher stake in Livent's public financings. It uniquely benefitted from

the application of the proceeds of the Notes sales to Livent's considerable debt to CIBC.

In response, CIBC insists that the Noteholders have not sufficiently alleged any instance in which CIBC itself made a specific actionable misstatement or omission to the investing public concerning Livent. It dismisses as "conclusory" the Noteholders "omissions" allegation that CIBC solicited and sold the Notes to investors without disclosing material facts relating to Livent's finances and its agreements with CIBC. As support for this argument, CIBC relies on *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997) and *Wright v. Ernst & Young LLP,* 152 F.3d 169 (2d Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999). It cites these cases for the proposition that, absent an independent fiduciary duty to disclose, an "omission" cannot form the basis for primary liability under § 10(b) by a secondary actor without an actual false or misleading prior statement made by the secondary actor at the time of dissemination. (Def.'s Mem. at 14–16.)

Both *Shapiro* and *Wright* involved claims against accountants in which plaintiffs alleged that the firms effectively aided the primary violator and participated in the underlying fraud by preparing financial statements alleged to be misleading, by failing to disclose material facts, or by approving financial information contained in a securities issuer's public statements that the accountants allegedly knew the company would disseminate. In *Wright,* the plaintiff maintained that while the company's press release at issue made no mention of a financial report directly attributed to Ernst & Young, the complaint nonetheless alleged a sufficient misrepresentation on the part of the accountants by virtue of their assurances to the company concerning the accuracy of certain financial results knowing that the company would, in turn, promptly publish that information to investors in its press release. *See Wright,* 152 F.3d at 173. In adopting the "bright line" test to give effect to the holding in *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439, that § 10(b) liability does not attach to conduct amounting to no more than aiding and abetting a primary violation, the Second Circuit underscored several essential points relevant to the instant dispute. *Wright,* 152 F.3d at 175.

■ First, the Circuit Court noted that a defendant must actually make a false or misleading statement in order to be held liable under § 10(b). *Id.* Second, the court reaffirmed the principle articulated in *Shapiro,* 123 F.3d at 720, that a defendant must "know or should know" that his representation would be communicated to investors. *Wright,* 152 F.3d at 175. (quoting *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226 (10th Cir.1996)). Third, the Circuit Court declared that there is "no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach." *Id.* (quoting *Anixter,* (77 F.3d at 1226)). The court stressed, however, that a secondary actor cannot incur primary § 10(b) liability for a statement not attributed to that actor at the time of its dissemination, that is, in advance of the investment decision. *See id.*

Fourth, the Circuit Court clarified that where the secondary actors do more than merely aid the primary violator by reviewing and approving alleged misrepresentations,—such as communicating directly to investors through the inclusion of their own statements in a report otherwise fraudulent issued by the primary violator—the secondary actor may incur primary liability under § 10(b). *See id.* (citing *In re Kendall Square Research Corp. Litigation,* 868 F.Supp. 26, 28 (D.Mass.

1994)); *see also Shapiro,* 123 F.3d at 721 (noting that where an accountant issues opinions or certified statements later discovered to be inaccurate, it has a duty to disclose the fraud to the public) (citing *In re Cascade Int'l Sec. Litig.,* 894 F.Supp. 437, 443 (S.D.Fla.1995)).

Finally, while the Second Circuit embraced the "bright line" rule as the governing standard for secondary actor liability cases this Circuit, it also acknowledged the continued effect in appropriate circumstances of its post-*Central Bank* holding in *SEC v. First Jersey Securities,* 101 F.3d 1450, 1471 (2d Cir.1996). There, in affirming the imposition of primary liability on a defendant who served as chief executive of the company and who was a "controlling person" in connection with fraud planned and directed by the company's upper level management, the Court of Appeals declared that "[p]rimary liability may be imposed 'not only in persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *Id.* (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994)).

The circumstances at issue in *Shapiro* and *Wright* are distinguishable from those now before this Court. *Shapiro* itself recognized a critical distinction. It is articulated in the Circuit Court's assertion that "[a]n accountant shares in an insider's duty to disclose if the accountant exchanges his or her role for a role as an insider who vends the company's securities." *Shapiro,* 123 F.3d at 721.

Also central to the rulings in *Shapiro* and *Wright* is that the complaints there failed to allege facts sufficient to establish how the secondary actor's misrepresentation or omission satisfied the reliance element required to state a sufficient § 10(b) claim. Because the secondary actor's alleged misstatement was expressed indirectly, and without attribution, through the public communication of the primary actor, the plaintiffs could not have known that the misrepresentation they claimed to have relied on at the time of the dissemination and in advance of the investment decision actually originated from the secondary actor. Accordingly, they were unable to demonstrate that their purchases of securities were affected by false or misleading statements contemporaneously made by or attributed to the secondary actor. *See Shapiro,* 123 F.3d at 720–21; *Wright,* 152 F.3d at 175.

Here, CIBC misconstrues the essential theory of the complaint. The Noteholders' pleadings, as now amended, allege misconduct that involved CIBC in more than merely aiding and abetting Livent's fraudulent transactions. Rather, read in their totality, and drawing all reasonable in the Noteholders' favor, the Noteholders' claims assert that CIBC played what amounts to a primary rather than a secondary role in the alleged misrepresentations. The Noteholders effectively state that CIBC was involved as an insider which not only aided in structuring the fraudulent arrangement embodied in the CIBC Wood Gundy Agreement but actually solicited and itself sold to public investors Notes whose financial worth depended in part on the truth concerning that transaction. The Noteholders contend that CIBC's false or misleading statements to investors were reflected not just in its omitting to disclose material facts in connection with its sales of Notes, but in more affirmative, if implicit misrepresentations.

The Court finds that these allegations are sufficient to state a claim that CIBC engaged in material misrepresentation or omission of facts in violation of § 10(b). CIBC's solicitation and sales communicate a statement, express or implied, to the investing public that conveyed the securi-

ties dealer's confidence in the market value of the Notes and in Livent's financial condition when, in fact, the secret portions of the CIBC Wood Gundy Agreement could reasonably be interpreted to signal the opposite: CIBC's awareness of Livent's weak financial condition, its lack of confidence in Livent's ability to pay its debts and a need to mischaracterize a loan as current investment revenue in order to sustain a misleading impression of Livent's finances upon which later public securities transactions were to be grounded. (TAC ¶ 246.) In other words, in pressing the Notes upon investors, CIBC conveyed an expression that the price of the securities reflected fair market value based on reliable financial disclosures. Through its solicitations and sales, CIBC necessarily disseminated to investors a false or misleading view concerning the value of the securities it sold as being supported by information CIBC knew or had reason to know was inaccurate.

In *First Jersey*, 101 F.3d at 1468, the Second Circuit sustained primary liability on a broker-dealer and its chief executive for implied representations concerning the prices and value of securities that were affected by material information the defendants withheld from purchasers. The court noted that:

> [w]hen First Jersey repurchased the units at issue here and sold their component securities to its retail customers without disclosing either the fact that it created and maintained the markets for those securities or the nature of its sales practices, the Firm impliedly represented that the prices paid for those securities reflected their value in a competitive market.

*Id.* The Court found that those intentional nondisclosures allowed the firm to manipulate the market for the securities "and to gain substantial profits for itself while depriving its customers of the ability to make an informed decision about the purchase or sale of the securities." *Id.; see also Norris & Hirschberg, Inc.*, 21 S.E.C. 865, 882 (1946), *aff'd* 177 F.2d 228, 232–33 (D.C.Cir. 1949) ("Each of [the broker-dealer's] sales carried with it the clear—though implied—representation that the price was reasonably related to that prevailing in an open market .... Without disclosure fully revealing that the 'market' was an internal system created, controlled, and dominated by the [broker-dealer] that representation was materially false and misleading.").

Unlike the charges against the accountants in *Shapiro* and *Wright*, the Noteholders' allegations at issue here assert misrepresentations or omissions communicated to investors directly by CIBC and at the time of the investment decision, rather than by an undisclosed secondary actor after the fact. In addition, here, also unlike the circumstances in *Shapiro* and *Wright*, the Noteholders set forth in sufficient detail that CIBC engaged in this alleged misconduct to promote its personal gain and interests in the success of the Notes as a means of securing payment of Livent's debt to CIBC. Though the complaint does not portray the extensive market manipulation on the part of CIBC of the kind found actionable in *First Jersey*, at this stage of the instant case, absent discovery, it is not possible to assess the full scope of the CIBC's purpose, involvement, benefits or injuries related to Livent's fraud. Nonetheless, the Court is persuaded that the Noteholders' amended pleadings contain enough factual assertions to state a sufficient § 10(b) claim and thus entitle them to proceed with discovery to address these and other disputed issues on a fuller record.

Finally, CIBC urges that in selling the Notes it acted merely as a broker. As such, CIBC contends that it had no inde-

pendent fiduciary duty to the Noteholders to disclose material facts concerning the Notes because brokers generally owe no fiduciary duties to purchasers of a security. *See Press v. Chemical Investment Servs. Corp.,* 166 F.3d 529, 536 (2d Cir. 1999). This argument is unavailing. As a general rule, a broker who ministerially executes orders to buy and sell securities is deemed an agent with no continuing obligation to advise a client or disclose special risks related to any particular transaction. *See, e.g., Kwiatkowski v. Bear Stearns & Co., Inc.,* 126 F.Supp.2d 672, 691–93 (S.D.N.Y.2000) (citing cases). But *Press* itself, upon which CIBC relies, expresses the general rule with a qualification: it applies "in the context of an ordinary broker-client relationship." 166 F.3d at 536. This statement recognizes that special case-by-case circumstances may arise under which the broker/client relationship may be said to be "fiduciary in nature," and which consequently may take a particular transaction outside the application of the general standard. *Kwiatkowski,* 126 F.Supp.2d at 692–93 (citing *Conway v. Icahn & Co.,* 16 F.3d 504, 509 (2d Cir. 1994)). In particular, special situations defined by agreements, by course of conduct or prior dealings reflecting matters entrusted to the broker could give rise to fiduciary duties on the part of a broker, or to a duty to exercise a higher degree of ordinary care in handling a client's accounts. *See id.*

In the TAC, the Noteholders assert that CIBC actively solicited and sold Notes not only to the class representatives and others, but to QIBs and to the public. (TAC ¶ 299.) At this stage of the proceedings, absent a more ample record, the Court cannot assess the full extent of CIBC's relationships to and communications with its Notes customers, and thus is unable to foreclose as a matter of law the possibility that among the Noteholders class there

may not be some with respect to whom CIBC stood in a relationship of more than a mere impersonal broker, and to whom in fact it may have owed larger fiduciary duties to disclose facts material to their investment. On this basis as well, the Court cannot conclude that it appears to a certainty that the Noteholders can prove no set of facts that would entitle them to relief on their § 10(b) claim against CIBC. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993). Accordingly, CIBC's motion to dismiss the Noteholders' § 10(b) claim is denied.

**B. *SECTION 11***

Under § 11 of the Securities Act, purchasers of securities issued pursuant to a registration statement containing false or misleading information may bring an action against any underwriter involved in the transaction. CIBC denies that it served as an underwriter in connection with the sale of registered Notes, contending that its role in Livent's financings was limited to participating, along with Paine Webber and Furman Selz, in an offering of Livent's unregistered notes to QIBs in a private placement undertaken pursuant to SEC Rule 144A.

In its June Decision, the Court found that the Noteholders' claims against Paine-Webber and Furman Selz did not sufficiently establish their involvement in the subsequent exchange of private Notes for registered Notes, or in marketing registered Notes to the public so as to qualify them as underwriters within the meaning of § 11. *See Livent Noteholders,* 151 F.Supp.2d at 432. With regard to CIBC, the Court noted that the Noteholders had argued in their opposition to CIBC's motion to dismiss, but had not claimed in the Second Amended Complaint, that CIBC

had sold registered Notes directly to the Noteholders and other public investors. *See id.* The Court thus dismissed the claim but granted leave to replead. The TAC now contains an allegation that the Noteholders purchased Notes directly from CIBC after being personally solicited for the sale by a CIBC broker. (TAC ¶ 265.)

CIBC again challenges these pleadings as insufficient. Citing provisions of the December 1997 Exchange Offer Prospectus, it argues that CIBC played the same role PaineWebber and Furman Selz performed as Initial Purchasers with respect to the private offering and sales of the Notes. Further, CIBC maintains that the Noteholders' pleadings do not assert that CIBC sold them Notes in its capacity as an underwriter of the Exchange Offer, suggesting that it is "entirely possible" that this allegation could be read to mean that CIBC acted as a broker-dealer in a secondary market sale of the Notes. Finally, CIBC asserts that the Noteholders' claim that CIBC served as an underwriter is contradicted by the express terms of the December 1997 Exchange Offer Prospectus, which stated that no underwriter was used in connection with the Exchange Offer. The Court finds these arguments unpersuasive.

As a threshold matter, the Court notes that, unlike a securities fraud action pursuant to § 10(b), to plead a sufficient claim under § 11 does not require the same degree of detail and particularity required by Fed.R.Civ.P. 9(b) and the PSLRA. All that is necessary to defeat a motion to dismiss is for a plaintiff to satisfy the Rule 8(a) requirement of providing a short and plain statement of the facts sufficient to give the defendant fair notice of the claim and showing that the pleader is entitled to relief. *See Conley,* 355 U.S. at 47–48, 78 S.Ct. 99; *see also* 2 James Wm. Moore et al., *Moore's Federal Practice* § 8.04[1] at 8–22 (3d ed.2001). Moreover, the Court must accept all well-pleaded facts as true and draw reasonable inferences in favor of the pleader. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Finally, the liberal notice rather than fact-based pleading philosophy Rule 8(a) codifies is further framed and reinforced by the mandate of Rule 8(f) that "[all] pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f).

Consistent with the lenient pleading standard these rules compel, the Court cannot find as a matter of law that the Noteholders' § 11 claim as amended remains deficient. The Noteholders now expressly state that they and other public investors, including QIBs, were solicited personally by and purchased Notes directly from CIBC "*after they had been registered.*" (TAC ¶ 300 (emphasis added).) They also make reference to CIBC "selling debt, which it no longer wished to hold, to the investing public...." (TAC ¶ 244.) These allegations may be read to assert that CIBC engaged in the public sale of registered securities, and that its role in connection with Livent debt financing exceeded that as CIBC contends of just an Initial Purchaser in the placement of private notes to QIBs. Juxtaposed with CIBC's assertions that it did not act as an underwriter and did not sell registered Notes, the Noteholders' contrary claims squarely raise issues of fact which cannot properly be decided on a Rule 12(b)(6) motion to dismiss the complaint.

CIBC's contentions that the Noteholders' allegation is "conclusory" and that it is "entirely possible" that this claim could be construed to mean what CIBC says it means are beside the point. It is just as equally, "entirely possible" that the pleadings could be interpreted as the Noteholders contend. For this very reason, the

central inquiry on a Rule 12(b)(6) motion to dismiss is not the likelihood that plaintiffs ultimately will prevail but whether they is entitled to an opportunity to pursue and offer evidence in support of their claims. *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). It is not the Court's function, in a considering such motions, to believe or disbelief allegations, to judge the merits of claims or to resolve factual disputes. Rather, the Court's only role is to determine the sufficiency of the pleadings. *See id.* ("Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal"). Indeed, in situations where factual disputes or ambiguities arise in connection with the pleadings on a Rule 12(b)(6) motion, the Court is obligated to draw all reasonable inferences in favor of the plaintiff. *See id.*

Moreover, while ordinarily the Court need not accept as true a conclusory allegation in the complaint otherwise contradicted by a statement in public filings upon which the pleadings rely, *see, e.g., Feick v. Fleener*, 653 F.2d 69, 75 n. 4 (2d Cir.1981), that rule may not apply under the circumstances the Noteholders describe here. The Court is not bound to deem true and give conclusive effect to factual assertions stated in those submissions, which "are relevant not to prove the truth of their contents but only to determine what the documents stated." *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). This qualification is especially pertinent where, as in this case, it is also "entirely possible" to infer from a fair reading of complaint, as the Noteholders suggest, that CIBC, given its alleged participation in Livent's fraud arising from its close, longstanding relationship with Livent, as well as its unique personal interest in the Notes transactions, could have played a substantial role in the preparation or review of the Registration Statement.

In doing so, CIBC may have had opportunity to formulate and give public expression to its own characterization of its role in connection with the Notes transactions as not having been that of an underwriter.

Whether the Noteholders can marshall enough evidence to prove their contentions is not a matter for the Court to pass upon at this stage of the proceedings. But further inquiry into the merits of fundamental factual issues such as these should not be foreclosed prior to adequate discovery by means of improvident relief pursuant to Rule 12(b)(6) motions to dismiss the complaint. Accordingly, CIBC's motion to deny the Noteholders' § 11 claim is denied.

## ORDER

For the reasons described above it is hereby

**ORDERED** that the motion of defendants CIBC Wood Gundy Securities, Inc. and CIBC Oppenheimer Securities Corp. to dismiss the Noteholders' claims pursuant to § 10(b) of the Exchange Act and § 11 of the Securities Act is denied; and it is finally

**ORDERED** that the parties proceed forthwith to develop and propose to the Court not later than thirty days from the date of this Order a draft Case Management Plan and Scheduling Order setting forth the steps and dates to guide discovery and other pretrial proceedings in this action.

**SO ORDERED.**